**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

BYRON MARTINEZ, et al.,     )
                              )
     Plaintiffs,          )
                              )
     v.                   )     Civil Action No. DKC-03-2118
                              )
JERHONDA B. HOLLOWAY, et al.     )
                              )
     Defendants.         )

**REPORT AND RECOMMENDATION**

On August 12, 2005, the Honorable Deborah K. Chasanow referred this case to the undersigned in accordance with 28 U.S.C. § 636 for determination of damages after the entry of default.[1]  *See* Docket No. 39.  On August 18, 2005, the undersigned issued an Order scheduling a damages hearing for September 27, 2005.  *See* Docket No. 40.  The Order was sent by electronic notice, via the Court's CM/ECF System, to Plaintiffs' counsel.  The Order was sent by regular mail and registered mail/return receipt requested to the three individual Defendants.[2]  The evidentiary hearing commenced on September 27, 2005 and continued and concluded on

---

[1] Order of September 23, 2004.  *See* Docket No. 19.  On January 14, 2005, Defendants filed a combined Motion to Vacate Entry of Default Order and Motion to Dismiss Case as to Erma Holloway and Jerhonda Holloway.  *See* Docket No. 32.  On May 18, 2005, Defendants filed a Reply to Plaintiffs' Opposition to Defendants' Motion to Vacate Entry of Default Order and Motion to Dismiss.  *See* Docket No. 35.  Five days later Judge Chasanow directed Defendants to provide original documents within 15 days.  *See* Docket No. 36.  On August 9, 2005, Judge Chasanow denied Defendants' Motion to Vacate Default since Defendants failed to file original documents with original signatures as ordered on May 23, 2005.  *See* Docket No. 37, at 1-2.  At the evidentiary hearing Defendant Cornell Holloway denied receiving the August 9, 2005 Order.  *See* Tr. 9:17 - 10:5.

[2] Defendant Cornell Holloway claimed he received the August 18, 2005 Order the week before September 27, 2005.  Defendant Holloway acknowledged that he has all business mail sent to this mailbox.  Defendant Holloway could not explain the discrepancy between the return receipt card, postmarked August 22, 2005, and his assertion that the undersigned's Order was not received until the week of September 19, 2005.  *See* Tr. 7:11 - 9:2.

1

September 28, 2005.  Eight[3] of the eleven Plaintiffs appeared and testified.[4]  Defendant Cornell[5]

Holloway appeared *pro se*.

## PROCEDURAL BACKGROUND

On July 18, 2003, Plaintiffs filed a Complaint against Defendants Jerhonda B. Holloway,

Erma L. Holloway, Cornell D. Holloway and Nicholas M. Martinez for unpaid wages, unpaid

minimum wages, unpaid overtime compensation and breach of contract.  The three Holloway

Defendants were served with Summons but not Defendant Nicholas Martinez.  On January 8,

2004, the three Holloway Defendants filed Motions for Extension of Time to Answer Complaint.

*See* Docket Nos. 7 - 9.  On August 6, 2004, the claims against Defendant Nicholas Martinez

were dismissed without prejudice.  *See* Docket No. 17.  In that same Order, Judge Chasanow

extended the time to September 3, 2004 for Jerhonda B. Holloway, Cornell D. Holloway and

Erma L. Holloway to answer or otherwise respond to the Complaint.

Having not received answers or other responses to the Complaint from the Holloway

Defendants, Judge Chasanow entered a default against the three Defendants on September 23,

2004.  *See* Docket No. 19.  On November 9, 2004, each of the eleven Plaintiffs filed an Affidavit

in Support of Motion for Default Judgment as to the three Holloway Defendants, Docket Nos. 20

- 30, and a collective Motion for Default Judgment, Docket No. 31.  On January 14, 2005, the

Holloway Defendants filed a Motion to Vacate Entry of Default Order and Motion to Dismiss

---

[3] Eleazar Perez, Jorge Castenda, Salvador Perez, Mauricio Ramos, Jose Renderos, Magdaleno Ayala, Ernesto Campos, and Jesus Mayorga.  Plaintiffs Bryon Martinez, Carlos Acuna, and Filemon Martinez were absent.

[4] All Plaintiffs are of Hispanic origin and speak limited English.  All Plaintiffs testified through Spanish language court interpreters Sonya Simek or Martha Gutierrez-Shepard.

[5] The caption of the Complaint lists this Defendant as *Cornel* D. Holloway.  In the body of the Complaint, this Defendant's first name is spelled **Cornell**.  In pleadings this Defendant spells his first name **Cornell**.  *See, e.g.,* Docket No. 32.

Case as to Erma Holloway and Jerhonda Holloway.  *See* Docket No. 32.  Plaintiffs filed a

Response in Opposition (Docket No. 34) and Defendants a Reply (Docket No. 35).  In the May

23, 2005 Order, Judge Chasanow directed Defendants to provide original documents with

original signatures within 15 days, and if so, their Motion to Vacate Default will be granted and

the court would deny Plaintiffs' Motions for Judgment by Default.  *See* Docket No. 36.  Further,

Judge Chasanow denied Defendants' Motion to Dismiss Case as to Defendants Erma Holloway

and Jerhonda Holloway, finding the allegations of the Complaint sufficient.

On August 9, 2005, Judge Chasanow denied Defendants' Motion to Vacate Default for

failing to file original documents with original signatures as directed.  *See* Docket No. 37.  In

that same Order the Plaintiffs' collective Motion for Judgment by Default was denied because

the affidavits were insufficient.

Pursuant to the Fair Labor Standards Act, the Maryland Wage and Hour Law, and the

Maryland Wage Payment and Collection Law, Plaintiffs seek actual, compensatory, statutory,

liquidated and punitive damages, as well as attorney's fees and costs and any other appropriate

relief.

## **PRELIMINARY MATTERS**

1.      Plaintiffs expressed a desire to dismiss without prejudice Defendant Erma L.

Holloway from this case.  Plaintiffs' counsel had a conversation with Defendant Cornell

Holloway on September 26, 2005.  Plaintiffs' counsel is satisfied that Defendant Erma L.

Holloway has no liability in this case.  Tr. 5:21 - 6:1.

2.      The undersigned explained he does not have the authority to dismiss Defendant

Erma L. Holloway but can make a recommendation to Judge Chasanow.  Tr. 6:2 - 4.

3

3.      Defendant Cornell Holloway ("C. Holloway") called the undersigned's Chambers on September 26, 2005 and requested a continuance.  During this conversation C. Holloway disclosed that he retained counsel, but his counsel could not attend the evidentiary hearing.  C. Holloway was referred to Plaintiffs' counsel regarding a continuance.  Tr. 4:18 - 24.

4.      That same day C. Holloway called Plaintiffs' counsel and requested a continuance.  Plaintiffs did not consent given the investment of time they put into preparing for the evidentiary hearing.  Tr. 4:10 - 17

5.      Before the taking of testimony, C. Holloway disclosed that he retained Mary Stablien as counsel.  The undersigned noted Ms. Stablien has not entered her appearance.  C. Holloway stated he is aware that Ms. Stablien probably has not notified the court that she represents him.  Tr. 4:25 - 5:18.

6.      After opening statement by Plaintiffs' counsel, C. Holloway requested a continuance because his attorney is not present and he is disadvantaged without legal representation.  C. Holloway also seeks a continuance because he and his counsel have not had the opportunity to interview the Plaintiffs individually.  Tr. 7:11 - 21; 10:15 - 11:10.

7.      The undersigned declined C. Holloway's request and proceeded with the evidentiary hearing.

## **FACTUAL FINDINGS**

8.      Plaintiff Eleazar Perez ("E. Perez"), a resident of Hyattsville, Maryland, is a carpenter.

9.      On July 15, 2001, E. Perez met Nicholas Martinez ("N. Martinez") and C.

Holloway[6] in the parking lot of Tick Tock in Langley Park[7], Maryland.

10.     N. Martinez translated on behalf of C. Holloway.

11.     C. Holloway offered E. Perez a job, cleaning work, in Pennsylvania.

12.     When E. Perez asked how much he would be paid, C. Holloway responded $10 per hour, $400 per week from Monday through Friday.

13.     C. Holloway would provide food and lodging.

14.     E. Perez accepted C. Holloway's offer of employment.

15.     N. Martinez and C. Holloway hired someone to drive E. Perez and his colleagues to Pennsylvania.  The colleagues who accompanied E. Perez are Jorge Castenda, Bryon Martinez and Carlos Acuna.

16.     E. Perez and his colleagues traveled to Pennsylvania on July 15, 2001, the same day C. Holloway offered and E. Perez accepted the job.

17.     When they arrived in Pennsylvania, E. Perez was taken to a K-Mart store to clean at 9:30 or 10:00 p.m.  A gentleman told E. Perez what to do to clean the store.

18.     On that first night E. Perez's duties consisted of sweeping, mopping, vacuuming, polishing the floors, cleaning the restaurant tables and cleaning everything in general.

19.     E. Perez worked 10 hours the first night, until 8:00 a.m. the next morning.

20.     At 8:00 a.m. C. Holloway's sister, Jerhonda Holloway ("J. Holloway"), picked up E. Perez from the K-Mart store and took E. Perez to the hotel paid for by C. Holloway.

21.     E. Perez worked at the K-Mart store for eight days.  Then C. Holloway's sister

---

[6] Mr. E. Perez and the other testifying Plaintiffs refer to Cornell Holloway as Mr. Cornell, Mr. Cornelio or Mr. Cornelius.

[7] Mr. E. Perez testified that Tick Tock is located in Hyattsville, Maryland. *See* Tr. 13:2 - 3.

moved E. Perez to a different K-Mart store where he worked approximately one week.

22.     E. Perez stopped working for C. Holloway and J. Holloway on July 29, 2001 because he had not been paid.

23.     E. Perez worked from July 15, 2001 to July 29, 2001 with no days off.

24.     On each of those days, E. Perez worked from between 9:00 and 10:00 p.m. to between 8:00 and 9:30 a.m.

25.     E. Perez worked occasionally beyond 8:00 a.m. because C. Holloway and J. Holloway assigned a K-Mart store to one employee and there was a lot of work to do to clean such a large store and that included cleaning the restaurant.

26.     C. Holloway and J. Holloway supervised E. Perez.

27.     On at least four occasions E. Perez requested to be paid.  J. Holloway would call C. Holloway.  She told E. Perez that C. Holloway was on his way to come and pay but C. Holloway never did.

28.     E. Perez was not paid for any of the work he performed.

29.     E. Perez returned to Maryland when a friend of a friend drove to Pennsylvania to pick up a group of employees because they had no money.

30.     According to E. Perez, Plaintiff Carlos Acuna stopped working for the Holloways and returned to Maryland on July 24, 2001.  Plaintiff Byron Martinez also stopped working in Pennsylvania and returned to Maryland the same day.

31.     E. Perez stated C. Holloway was supposed to pay him $400 per week and denied being told that N. Martinez was going to receive E. Perez's pay.

32.     E. Perez is not familiar with Seven Gold Stars, allegedly N. Martinez's company.

E. Perez recalls N. Martinez mentioned something about some stars but did not pay attention to it.

33.     N. Martinez told E. Perez that he (E. Perez) would be working for C. Holloway's company.

34.     N. Martinez told E. Perez that he would be paid $400 per week on a weekly basis.

35.     E. Perez never worked for C. Holloway in Maryland.

36.     E. Perez worked for C. Holloway in Pittsburgh, Pennsylvania.

37.     E. Perez does not know which stores Acuna and B. Martinez worked because they were all placed separately.  He does know they also cleaned K-Mart stores.

38.     According to E. Perez, Acuna and B. Martinez worked the same schedule as he, because they were transported together to different K-Marts.  E. Perez was the first to be dropped off, then they were taken to other K-Mart stores.  E. Perez was the last one picked up.

39.     Acuna and B. Martinez were told they would make $10 per hour or $400 per week.  Acuna, B. Martinez and E. Perez were present together in the Tick Tock parking lot when N. Martinez on behalf of C. Holloway offered employment and explained how much they would earn.

40.     Plaintiff Jorge Castenda resides in Silver Spring, Maryland and is a gardener.

41.     On July 15, 2001, Castenda, along with three comrades[8], talked with N. Martinez and C. Holloway at Tick Tock.  Castenda and his comrades were offered work in Pennsylvania.  The job would pay $10 an hour, $400 a week, working Monday through Friday.  Hotel and food would be provided.

---

[8] Daniel Perez, Byron Martinez and Carlos Acuna.  Tr. 32:22 - 25.  The undersigned assumes Castenda is referring to Eleazar Perez.

42.     Castenda accepted the offer because N. Martinez was translating for C. Holloway at the moment of the offer.

43.     That same day C. Holloway arranged for a driver to take Castenda and his comrades to Pennsylvania.

44.     That same night Castenda began working.  He, along with his comrades, were picked up from the hotel at 9:00 p.m.  He started working at a K-Mart store at 10:00 p.m.

45.     The first night Castenda worked, there was another employee at the K-Mart store. Castenda was shown where the tools were, and how to use them.

46.     Castenda's duties consisted of sweeping, polishing the floors, vacuuming, mopping the floors, and cleaning the kitchen.

47.     The first night Castenda worked from 10:00 p.m. to 7:00 a.m.

48.     Castenda would finish working between 7:00 and 8:00 a.m.  He would wait to be picked up from the store.  Sometime his ride would not come until 12 noon.

49.     During his employment Castenda worked at several K-Marts and ultimately worked at a K-Mart in Ohio.

50.     Initially, J. Holloway drove Castenda to Ohio.  Then she asked if he had a driver's license.  He responded yes.

51.     J. Holloway loaned a car to Castenda to drive to Ohio and provided him a map.

52.     In Ohio Castenda typically worked from 10:00 p.m. to 7:00 a.m. at a K-Mart store.

53.     Castenda worked from July 15, 2001 to August 8, 2001.  He worked every day, never taking a day off.

54.     Castenda was not paid for his labor.

55.     Castenda requested his pay.  J. Holloway would say that she would call her brother and that he would come later, but C. Holloway never did.

56.     Castenda stopped working on August 8, 2001 because he had not been paid and his family was suffering because they did not have anything to eat.

57.     Castenda had to ask people for money to pay for his transportation back to Silver Spring, Maryland.

58.     When he returned to Silver Spring, Castenda did not communicate with C. Holloway.  However, Castenda did speak with N. Martinez, who promised that, if he (Castenda) returned to Pennsylvania, he would be paid.

59.     Castenda declined to continue working for C. Holloway.

60.     To date Castenda has not been paid for the work he performed.

61.     When Castenda accepted C. Holloway's offer of employment in Maryland, Castenda was told he would work five days and have two days off.  However, when he arrived in Pennsylvania, the work schedule was changed.  Castenda worked every day.  He was never offered a day off.

62.     Castenda did not work for C. Holloway in the State of Maryland.

63.     Plaintiff Salvador Perez ("S. Perez"), a resident of Takoma Park, Maryland, is a gardener.

64.     S. Perez met N. Martinez in the Tick Tock parking lot on July 15, 2001.

65.     Plaintiffs Mauricio Ramos and Filemon Martinez were also present at the meeting.

9

66.     N. Martinez told S. Perez and the others that C. Holloway is supposed to arrive and that he is the boss of a company that will employ them.

67.     N. Martinez also informed them the work would be in Pennsylvania; they would be paid $400 for working Monday through Friday and they would be given free room and board. Also, N. Martinez stated that S. Perez and his colleagues would be paid weekly on Friday afternoon.  C. Holloway subsequently arrived at the Tick Tock parking lot.

68.     S. Perez and Plaintiffs Ramos and F. Martinez accepted the offer of employment.

69.     S. Perez and his colleagues were hired on July 15th but did not travel to Pennsylvania until July 16th.

70.     C. Holloway drove S. Perez, Ramos and F. Martinez to Pennsylvania on July 16, 2001 and took them to a hotel.

71.     That night, at 9:00 p.m., S. Perez began working at a K-Mart store.

72.     During his first night, S. Perez worked with another gentleman.  S. Perez's duties consisted of removing trash, sweeping, mopping, vacuuming and polishing the floors.

73.     S. Perez worked until 7:30 a.m. the next morning.

74.     J. Holloway or another driver would pick up S. Perez from the job site in the morning.

75.     S. Perez worked for C. Holloway and J. Holloway for a month.

76.     S. Perez maintained a record of the days and hours he worked.  This piece of paper was offered and admitted as Plaintiffs' Exhibit 1.

77.     S. Perez recorded information in three columns.  For example, next to a block

labeled "Julio" for July, in the first row S. Perez wrote "L   16   8." He explained that "L[9]" stands for Monday, "16" is the day of the month (July 16th) and "8" represents the hours worked.

78.     S. Perez testified that he worked for C. Holloway from July 16 - 29, 2001, ten hours each day, with no days off.  When he received no pay for his work, S. Perez decided to return to Maryland.

79.     After returning to Maryland, S. Perez recalls receiving a telephone call from N. Martinez who stated C. Holloway needed S. Perez to return to work because there is a lot of work.  N. Martinez stated, if S. Perez returned, C. Holloway would pay S. Perez plus give a raise.

80.     N. Martinez stated S. Perez would make more than $400 but the actual amount of the higher wage was never confirmed.

81.     S. Perez returned to work for C. Holloway starting on August 5, 2001.  S. Perez worked until August 20th.  S. Perez learned there was a sick child in his family.  He was unable to help.

82.     On August 20th, S. Perez decided to call the police and explain his predicament.  Also, he was not feeling well.  He relayed this information to the supervisors who called C. Holloway.  C. Holloway arrived around 5:00 p.m. and gave S. Perez a check written in the amount of $310.

83.     A copy of the check was introduced and admitted as Plaintiffs' Exhibit 2.

84.     Defendant Erma L. Holloway is the account holder of the check written to "Salvador."

---

[9] The Spanish word for Monday is "Lunes."

85.     When S. Perez stopped working, C. Holloway took him to the Greyhound office and purchased a ticket.

86.     After returning to Silver Spring the second time, S. Perez contacted CASA Maryland about his situation.

87.     S. Perez did not receive any additional money for the hours he worked.

88.     When S. Perez and his colleagues were not paid on Friday as promised, because they could not communicate with C. Holloway, they called N. Martinez.  He would tell them C. Holloway is coming to pay you.  C. Holloway never appeared.

89.     N. Martinez described his relationship with C. Holloway as a head hunter, getting employees for C. Holloway.

90.     S. Perez testified that he worked every day from 9:00 p.m. to 7:30 a.m.

91.     S. Perez did not work for C. Holloway in the State of Maryland.

92.     Plaintiff Mauricio Ramos, a resident of Hyattsville, Maryland, is a painter.

93.     According to Ramos, S. Perez told him about an opportunity to work in Pennsylvania for $10 per hour at night cleaning K-Mart stores.

94.     Ramos was hired on July 15th in front of Tick Tock located on University Boulevard.  He started working July 16th and finished working July 29, 2001.

95.     C. Holloway drove Ramos, along with S. Perez and F. Martinez, to Pennsylvania.

96.     The first night Ramos began working at a K-Mart store at 9:00 p.m.  He finished between 7:00 - 8:00 a.m. the following morning.

97.     Ramos worked every day, with no days off, from July 16 - 29, 2001.

98.     Ramos quit the job on July 29, 2001 because he had not been paid and because

the owner of the hotel intended to evict him because the bill had not been paid.  C. Holloway was supposed to pay the lodging expenses.

99.     Ramos called a gentleman, a Mexican, who picked up Ramos, F. Martinez, E. Perez and S. Perez and transported them to Maryland.

100.    According to Ramos, F. Martinez worked the exact same days as he, July 16 - 29, 2001.  Ramos knows this because they were hired together and lived together in Pennsylvania.

101.    From July 16 - 29, 2001, Ramos received no money for the work he performed on behalf of the Holloways.

102.    To date Ramos has not been paid by the Holloways for his labor.

103.    Ramos did not ask J. Holloway for payment.  The group instead would call N. Martinez.

104.    N. Martinez introduced C. Holloway to Ramos.

105.    N. Martinez told Ramos and his two colleagues that they would be paid weekly.

106.    Ramos did not work for C. Holloway in the State of Maryland.

107.    Plaintiff Jorge Renderos, a resident of Hyattsville, Maryland, is a plumber.

108.    Renderos met C. Holloway and N. Martinez on November 28, 2001 at the Tick Tock store between University Boulevard and Riggs Road in Langley Park, Maryland.

109.    Three friends were with Renderos: Plaintiffs Magdaleno Ayala, Ernesto Campos and Jesus Mayorga.

110.    C. Holloway offered Renderos and his three friends jobs cleaning K-Marts in Pennsylvania.  They discussed prices, wages and how C. Holloway was going to pay the workers.

111.    C. Holloway offered to pay $400 per week for working Monday through Friday. He also offered lodging.

112.    Renderos accepted C. Holloway's offer.

113.    Renderos, his three friends and C. Holloway departed for Pittsburgh, Pennsylvania the night of November 28, 2001.

114.    When they arrived in Pittsburgh, C. Holloway took the four workers to a townhouse.

115.    Renderos began working the next day, November 29, 2001.  He and Campos worked together the first night starting at 9:00 p.m.

116.    Their duties included taking out the trash, sweeping the floors, mopping the floors, polishing the floors. They worked until 7:00 a.m. the next morning.

117.    Renderos stated the terms of the employment changed when they arrived in Pittsburgh.  C. Holloway told Renderos and his three friends that they had to work two weeks in order to be paid one week.  Further, C. Holloway stated they had to work six days in order to earn $400.

118.    By December 11, 2001, Renderos and his three friends had not been paid and did not even have money to buy food to eat.  Mayorga's brother, who speaks English, asked C. Holloway for money on behalf of Renderos and his friends.  C. Holloway agreed to give them an advance.  They each received $100.

119.    Renderos received no other money from C. Holloway or J. Holloway for the worked he performed in Pennsylvania.

120.    When Renderos returned to Maryland, he reported his experience to CASA

Maryland.

121.     According to Renderos, N. Martinez never mentioned having a company but N. Martinez did say that C. Holloway was going to establish another company in Silver Spring, Maryland.  Renderos recalls C. Holloway saying he would establish Seven Gold Stars or something like that.

122.     Renderos claims, when they arrived at the house in Pennsylvania, there was no food.  He and his three friends pooled their money and purchased food.

123.     After working approximately 10 days with no pay, Renderos and his three friends told the owner of the house, Ali, that they will stop working.  Shortly thereafter, C. Holloway gave Renderos and his three friends $100 each.

124.     When Renderos and his friends asked J. Holloway, when will we get paid, she would always respond, "tomorrow, tomorrow, tomorrow, he (C. Holloway) is coming tomorrow."  C. Holloway however never appeared.

125.     Renderos denied having a conversation with N. Martinez while in Pennsylvania, from November 28 to December 11, 2001.  But he acknowledged someone else did speak with N. Martinez.

126.     Plaintiff Magdaleno Ayala, a resident of Hyattsville, Maryland, is a bricklayer.

127.     Ayala met C. Holloway and N. Martinez on November 28, 2001 in the Tick Tock store in Langley Park, Maryland along with Renderos, Mayorga and Campos.

128.     C. Holloway promised to give the group a job, stated they would be paid $400 weekly, promised to provide lodging but did not discuss paying for food.

129.     Ayala accepted C. Holloway's offer.

15

130.    Ayala began working on November 29, 2001 at a K-Mart store in Pittsburgh, Pennsylvania.

131.    The first night Ayala worked at a K-Mart store with another individual.  He worked 9:00 p.m to 7:00 a.m.

132.    The second night Ayala worked with Campos.  The remaining 10 days Ayala worked alone at a K-Mart store.  He worked 9:00 p.m. to 7:00 a.m.

133.    On December 10, 2001, Ayala and his colleagues did not have money to buy food.  C. Holloway came to the apartment that evening around 5:00 p.m. and gave $100 each to Ayala and his three colleagues.

134.    December 11, 2001 was the last day Ayala worked for C. Holloway.  Similarly, that date was the last day Mayorga and Campos worked for C. Holloway.

135.    J. Holloway would pick up Ayala and his colleagues every day and take them to the K-Mart stores.  On December 11, 2001, the four men decided they did not want to go to work.  They quit.

136.    C. Holloway told the four men, if they were not going to work anymore, they could not reside in the apartment.  Ayala and his three colleagues returned to Maryland on December 11, 2001.

137.    To date Ayala has not been paid for any of the days he worked in Pennsylvania for C. Holloway.

138.    According to Ayala, N. Martinez talked with Renderos about the opportunity to work in Pennsylvania.  N. Martinez made an appointment with Renderos to meet at the Tick Tock.  When they met, N. Martinez told Renderos and his three friends that they would earn

$400 per week for five days of work.  The discussion about pay occurred before C. Holloway arrived at the Tick Tock.

139.    Ayala stated, after arriving in Pennsylvania, he worked every day, rather than five days a week, because J. Holloway told the group there are no days off.  In response the group told J. Holloway they need at least one day off but she replied no, no day off.

140.    On cross examination Ayala explained, the first two days when he worked with another employee, he worked 9:00 p.m. to 6:00 a.m.  The remaining 10 days that Ayala worked alone at a K-Mart store, he worked 9:00 p.m. to 7:00 a.m.

141.    Through Mayorga's brother, Ayala asked J. Holloway about getting paid.  J. Holloway said she would call C. Holloway about the money.

142.    Ayala did not work for C. Holloway in the State of Maryland.

143.    Plaintiff Ernesto Campos[10], a resident of Hyattsville, Maryland, works delivering or providing items to restaurants.

144.    Renderos told Campos that there was an opportunity to work in Pennsylvania and also told Campos that N. Martinez was hiring workers for C. Holloway.

145.    Campos met N. Martinez and C. Holloway at the Tick Tock on November 28, 2001.

146.    Because C. Holloway does not speak Spanish, N. Martinez was translating.

147.    C. Holloway offered to pay Campos $400 per week for five days of work (Monday to Friday), eight hours per day.  Campos accepted C. Holloway's offer.

148.    C. Holloway then told N. Martinez to tell Campos and his colleagues to pack their

---

[10] In the Complaint this Plaintiff is identified as Ernesto Campos.  However, at the evidentiary hearing, he identified himself as Ernesto Campos Herrera.  Tr. 123:21 - 23.

clothes because the job would last several days.

149.    C. Holloway and the four newly hired employees traveled to Pennsylvania on November 28, 2001.  C. Holloway took the four men to Mr. Lee's house.

150.    Campos and his colleague did not work on the 28th because they arrived too late at night.  They began working the next day.

151.    The first night, November 29, 2001, Campos worked from 9:00 p.m. to 7:30 a.m. at a K-Mart store.

152.    Campos' duties included sweeping, emptying the trash, cleaning the bathroom and restaurant, vacuuming, and polishing the floors.

153.    Campos worked a total of 12 days, consecutive, with no days off.

154.    Campos' duties and the hours worked were the same for the remaining 11 days.

155.    Campos has not been paid for the work he performed.

156.    Campos did not receive any money from J. Holloway or N. Martinez.  C. Holloway gave Campos $100.

157.    While in Pennsylvania, Campos called N. Martinez seeking payment of wages. N. Martinez was in Silver Spring.  Mr. Campos also called N. Martinez because he was not feeling well and wanted to return to Maryland.  Campos called N. Martinez five or six times while Campos was in Pennsylvania.

158.    J. Holloway picked up Campos daily.  She would inspect Campos' work.  If she found a deficiency, she would instruct Campos to correct it.

159.    To date Campos has not been paid for the work he performed.

160.    Campos learned about the job opportunity from  Renderos.  According to

18

Campos it was known in the Langley Park area that C. Holloway hired individuals there and that N. Martinez translated for C. Holloway because C. Holloway did not speak Spanish.

161.    Campos met N. Martinez and C. Holloway at the Tick Tock.  With N. Martinez translating, C. Holloway promised to pay weekly though Campos understood that he had to work two weeks before receiving his first paycheck.

162.    Campos denied that N. Martinez gave him or his three colleagues money before the group departed for Pennsylvania.

163.    According to Campos, he and his three colleagues left Pennsylvania because C. Holloway kicked them out of Mr. Lee's house.  Campos wanted to report his situation to the police but he and his colleagues did not speak English.  The police hailed a taxi to take the group to the Greyhound Station.  They took a bus and returned to Maryland.

164.    When Campos returned to Silver Spring, he contacted CASA Maryland.

165.    Upon returning to Maryland, Campos did not call N. Martinez or C. Holloway per the advice of CASA Maryland.

166.    Campos did not work for C. Holloway in the State of Maryland.

167.    Plaintiff Jesus Mayorga, a resident of Hyattsville, Maryland, is a roofer.

168.    Mayorga met C. Holloway through N. Martinez in front of the Tick Tock on November 28, 2001.

169.    Mayorga, Campos, Ayala and Renderos traveled to Pennsylvania in C. Holloway's car.

170.    Mayorga started working November 29, 2001.  He was taken to a K-Mart at 9:00 p.m.  His duties included sweeping, mopping, polishing the floors, emptying trash cans, cleaning

the bathroom and cleaning the restaurant.

171.    Mayorga completed his duties between 6:00 a.m. and 7:00 a.m.  Thereafter, he waited for J. Holloway to pick him up.

172.    Mayorga stopped working for the Holloways on December 11, 2001.  He had worked every day starting from November 29, 2001.

173.    The only payment Mayorga received from C. Holloway was $100.

174.    Mayorga called N. Martinez (who was in Silver Spring, Maryland) two or three times after arriving in Pennsylvania.  Mayorga asked N. Martinez to speak with C. Holloway about paying Mayorga and his colleagues the wages promised.

175.    Mayorga did not work for C. Holloway in the State of Maryland.

176.    Plaintiff Byron Martinez did not attend the evidentiary hearing.

177.    Plaintiff Carlos Acuna did not attend the evidentiary hearing.

178.    Plaintiff Filemon Martinez did not attend the evidentiary hearing.

179.    Defendant Cornell Holloway proffered that he gave N. Martinez money to pay the Plaintiffs for their labor.  Apparently, N. Martinez failed to pay the Plaintiffs.  Tr. 74:11 - 75:2.

180.    Plaintiffs' counsel proffered that the Plaintiffs' work day ended at 7:30 a.m. despite testimony from some of the Plaintiffs that they worked beyond 7:30 a.m.  Tr. 138:6 - 9.

## ANALYSIS

181.    The issue of liability has been determined by Judge Chasanow with the entry of a default.  *See* Docket No. 19.  The sole issue to be determined is damages.

182.    Three of the eleven Plaintiffs — Bryon Martinez, Carlos Acuna and Filemon Martinez — did not appear at the evidentiary hearing.

183.     Citing *Reich v. Southern Maryland Hosp. Inc.*, 43 F.3d 949 (4th Cir. 1995),

Plaintiffs' counsel asks the court to find that the eight testifying Plaintiffs did testify on behalf of

the three non-testifying Plaintiffs.  Plaintiffs' counsel asks the court to make reasonable

assumptions about the number of days and hours worked by Bryon Martinez, Carols Acuna and

Filemon Martinez.

184.     In *Reich* the Court of Appeals for the Fourth Circuit found the district court

abused its discretion by limiting testimony to only 1.6% (54 of 3368) of the Hospital's

employees in awarding back pay and liquidated damages.  *Reich*, 43 F.3d at 951.

185.     An employee who brings a claim for unpaid minimum wages or unpaid overtime

compensation under the Fair Labor Standards Act ("FLSA") has the burden of proving that he

worked the hours performed and was not properly compensated.  *Anderson v. Mt. Clemens*

*Pottery Co.*, 328 U.S. 680, 686-87 (1946).

186.     Under the FLSA the employer has a duty to maintain records of the dates and

hours its employees worked as well as the wages paid.  "Every employer subject to any

provision of this chapter . . . shall make, keep, and preserve such records of the persons

employed by him and of the wages, hours, and other conditions and practices of employment

maintained by him, and shall preserve such records for such periods of time. . . ."  29 U.S.C. §

211(c).

187.     An employee may compel those records from the employer.  In securing such

records the employee satisfies his burden.  *Mt. Clemens Pottery*, 328 U.S. at 687.

188.     If an employer fails to maintain the required records or if the records are

inaccurate or inadequate, the employee is not penalized by denying his claim because he is

unable to prove the precise hours of uncompensated work.  *Id.*

189.    "In such a situation . . . an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference."  *Id*.

190.    Eight of the eleven Plaintiffs testified.

191.    The eight testifying Plaintiffs cleaned K-Mart stores in the Commonwealth of Pennsylvania or the State of Ohio for Defendant C. Holloway.

192.    The eight testifying Plaintiffs cleaned K-Mart stores during the "night shift" between 9:00 - 10:00 p.m. to 8:00 a.m.

193.    The eight testifying Plaintiffs performed substantially similar, if not identical work, at K-Mart stores:  sweeping, mopping, vacuuming, polishing the floors, removing trash, cleaning the bathroom and cleaning the restaurant.

194.    Plaintiffs E. Perez and Castenda, along with non-testifying Plaintiffs B. Martinez and Acuna, were hired by Defendant C. Holloway on July 15, 2001 and began working for him in Pennsylvania that same date.

195.    In the presence of E. Perez, Castenda, B. Martinez and Acuna, Defendant C. Holloway offered to pay $10 per hour or $400 per week for work performed Monday through Friday.

196.    Plaintiffs E. Perez and Castenda, as well as non-testifying Plaintiffs B. Martinez and Acuna, accepted Defendant C. Holloway's offer.

197.    According to Plaintiff E. Perez, non-testifying Plaintiffs B. Martinez and Acuna

worked the same schedule as he although they worked at other K-Mart stores.

198.   According to Plaintiff E. Perez, non-testifying Plaintiffs B. Martinez and Acuna stopped working for Defendant C. Holloway on July 24, 2001 and returned to Maryland that same date.

199.   The testimony of Plaintiff E. Perez, along with the testimonies of the seven other Plaintiffs who appeared at the evidentiary hearing, establishes a *prima facie* case for the hours of uncompensated work performed by Plaintiffs B. Martinez and Acuna.  *See McLaughlin v. Hot Fat Seto*, 850 F.2d 586, 589 (9th Cir. 1988).

200.   Defendant C. Holloway did not present any evidence to negate the just and reasonable inference that Plaintiffs B. Martinez and Acuna worked for the Defendant from July 15 to 24, 2001, nine consecutive days, from 10:00 p.m. to 8:00 a.m., 10 hours each day.

201.   "Virtually all of the cases using representative testimony involve a fairly small employee population, a limited number of employee positions, and uniform work tasks."  *Reich*, 43 F.3d at 952.

202.   Non-testifying Plaintiff F. Martinez, along with Plaintiffs S. Perez and Ramos, accepted Defendant C. Holloway's job offer of $10 per hour, $400 per week working Monday through Friday on July 15, 2001 and began working for Defendant C. Holloway in Pennsylvania on July 16, 2001.

203.   Although non-testifying Plaintiff F. Martinez worked at a different K-Mart store than Plaintiff Ramos, the latter was familiar with Plaintiff F. Martinez's schedule because they worked the same days, were hired together and lived together in lodging provided by Defendant C. Holloway.

204.    The testimony of Plaintiff Ramos, along with the testimonies of the seven other Plaintiffs who appeared at the evidentiary hearing, establishes a *prima facie* case for the hours of uncompensated work performed by Plaintiff F. Martinez.  *See Hot Fat Seto*, 850 F.2d at 589.

205.    Defendant C. Holloway did not present any evidence to negate the just and reasonable inference that Plaintiff F. Martinez worked from July 16 to 29, 2001, thirteen consecutive days, from 9:00 p.m. to 7:00 a.m., 10 hours each day.

206.    The undersigned finds the Plaintiffs worked for Defendant C. Holloway and J. Holloway as follows:

| *Plaintiff* | *Dates* | *No. of Days* | *Hours* | *No. of Hours* |
|---|---|---|---|---|
| E. Perez | 07/15 - 29/01 | 14 days | 10 pm - 8 am | 10 hours |
| Castenda | 07/15 - 08/08/01 | 24 days | 10 pm - 8 am | 10 hours[11] |
| B. Martinez | 07/15 - 24/01 | 9 days | 10 pm - 8 am | 10 hours |
| Acuna | 07/15 - 24/01 | 9 days | 10 pm - 8 am | 10 hours |

---

[11] Plaintiff Castenda testified that he typically worked 10:00 p.m. to 7:00 a.m. but sometimes worked until 8:00 a.m.  *See* Tr. 35:15 - 21.  Castenda also testified that he worked 10:00 p.m. to 7:00 a.m. when he worked at a K-Mart store in Ohio.  *See* Tr. 38:9 - 11.  Considering that Castenda testified that he sometimes worked to 8:00 am, that all the other Plaintiffs testified working 10 hours per day and that Castenda is testifying about events which occurred over four years ago and his recollection may not be very precise about the hours worked, the undersigned finds Castenda worked 10 hours a day.

| S. Perez | 07/16 - 29/01 & 08/05 - 20/01[12] | 28 days[13] | 9 pm - 7 am | 10 hours[14] |
|---|---|---|---|---|
| Ramos | 07/16 - 29/01 | 13 days | 9 pm - 7 am | 10 hours |
| F. Martinez | 07/16 - 29/01 | 13 days | 9 pm - 7 am | 10 hours |
| Renderos | 11/29 - 12/11/01 | 12 days | 9 pm - 7 am | 10 hours |

---

[12] Plaintiff S. Perez testified that he worked July 16 - 29, 2001 and returned to Maryland on the 29th because he and his colleagues had not been paid.  *See* Tr. 52:23-24, 53:22 - 24.  S. Perez maintained a log contemporaneous with the days he worked.  The log, Plaintiffs' Exhibit 1, shows S. Perez worked from July 16 - 28, 2001.  However, S. Perez's testimony that he worked until the 29th is corroborated by Plaintiff Ramos who testified that he, S. Perez, F. Martinez and E. Perez left Pennsylvania and returned to Maryland.  *See* Tr. 67:14 - 23.  Plaintiff E. Perez testified that he stopped working on July 29, 2001.  *See* Tr. 18:19 - 23.

At the evidentiary hearing, Plaintiff S. Perez testified that he worked August 5 - 20, 2001.  *See* Tr. 54:5 - 6.  On cross-examination S. Perez testified that he returned to Maryland on August 21, 2001.  *See* Tr. 60:20 - 23.  On the log, S. Perez recorded that he worked August 5 through 21, 2001.  *See* Plaintiffs' Ex. 1.

The undersigned notes the log S. Perez maintained lists the days worked as July 16 - 28, 2001 and August 5 - 21, 2001.  At the evidentiary hearing S. Perez testified that he worked July 16 - 29, 2001 and August 5 - 20, 2001.  Irrespective of this slight discrepancy regarding dates, S. Perez's contemporaneous log and his sworn testimony reveal S. Perez worked **28** days.

[13] Plaintiffs claim S. Perez worked 29 days, but for the reasons listed *supra*, the undersigned finds Plaintiff S. Perez worked 28 days.

[14] Plaintiff S. Perez' contemporaneous log records that he worked 8 hours per day.  S. Perez testified that he worked approximately 9:00 p.m. to 7:00 a.m.  S. Perez explained the third column of his log as follows:

> Q:  And the 8?
> A:  Well, that was supposed to be the hours.
> Q:  And why do you say supposed to be?
> A:  Well, that's what it is.  That's what it is, the hours worked or done.

Tr. 53:12 - 16.

The undersigned reasonably infers from this testimony that S. Perez, when hired, was supposed to work 8 hours per day but when he arrived in Pennsylvania he actually worked more.  The undersigned finds S. Perez worked 10 hours per day.

| Ayala | 11/29 - 12/11/01 | 12 days | 9 pm - 7am[15] | 10 hours |
| Campos | 11/29 - 12/11/01 | 12 days | 9 pm - 7am | 10 hours |
| Mayorga | 11/29 - 12/11/01 | 12 days | 9 pm - 7 am | 10 hours |

207.    Under the FLSA every employer shall pay his employees engaged in commerce in any workweek a minimum wage of $5.15 per hour.  29 U.S.C. § 206(a)(1).  "[T[he FLSA was designed to give specific minimum protections to *individual* workers and to ensure that *each* employee covered by the Act would receive '[a] fair day's pay for a fair day's work' and would be protected from the evil of 'overwork' as well as 'underpay.'" *Barrentine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728, 739 (1981).

208.    An employee who works more than forty hours a workweek is entitled to overtime compensation at a rate not less than one and one-half times the regular rate the employee is paid.  29 U.S.C. § 207(a)(1).

209.    One and one-half times the minimum wage of $5.15 per hour equals $7.73.

210.    The $7.73 rate for overtime work does not apply to this case because there was an agreement or understanding between Defendant C. Holloway and the Plaintiffs that Plaintiffs would be paid $10.00 per hour.  "There must be an agreement or understanding establishing a basic rate or rates.  This agreement must be arrived at before performance of the work to which it

---

[15] During direct examination Plaintiff Ayala testified that he worked 9:00 p.m. to 7:00 a.m each of the 12 days he worked for Defendants.  However, on cross-examination, Ayala testified that he worked 9:00 p.m. to 6:00 a.m. the first two nights while working with another employee and worked 9:00 p.m. to 7:00 a.m. the other 10 days when he worked alone cleaning a K-Mart store.  Ayala's testimony regarding the number of hours worked the first two days is inconsistent.  Considering the testimony of Ayala's other three colleagues (Renderos, Campos and Mayorga) who worked identical schedules, the undersigned finds Ayala worked 9:00 p.m. to 7:00 a.m. each of the 12 days he worked for Defendants.

is intended to apply." 29 C.F.R. § 548.200(a) (2001). At the Tick Tock in Langley Park, Maryland, before traveling to Pennsylvania, the Plaintiffs and Defendant C. Holloway established a basic rate of $10.00 per hour.

211.    "Overtime hours are compensated at a rate of not less than one and one-half times such established basic rate[.]" 29 C.F.R. § 548.2(f) (2001). In this case, one and one-half times the established basic rate of $10.00 per hour equals $15.00.

212.    "The Act takes a single workweek as its standard and does not permit averaging of hours over 2 or more weeks. Thus, if an employee works 30 hours one week and 50 hours the next, he must receive overtime compensation for the overtime hours worked beyond the applicable maximum in the second week, even though the average number of hours worked in the 2 weeks in 40." 29 C.F.R. § 778.104 (2001).

213.    The regular hours and overtime each Plaintiff worked are listed below based on a Monday through Friday workweek:

| Plaintiff | Days Worked | Hours Worked | Regular Hours | Overtime |
|-----------|-------------|--------------|---------------|----------|
| E. Perez | 14 days | 14 x 10 = 140 | 80 hours | 60 hours |
| Castenda | 24 days | 24 x 10 = 240 | 150 hours | 90 hours |
| B. Martinez | 9 days | 9 x 10 = 90 | 60 hours[16] | 30 hours |
| Acuna | 9 days | 9 x 10 = 90 | 60 hours | 30 hours |
| S. Perez | 28 days | 28 x 10 = 280 | 170 hours | 110 hours |

---

[16] At the evidentiary hearing Plaintiffs' counsel presented two different sets of calculations, one assuming an eight-hour workday without overtime compensation and the other a ten-hour workday with overtime compensation. The undersigned has determined the Plaintiffs worked 10 hour days. Plaintiffs' counsel has calculated that Plaintiffs B. Martinez and Acuna worked 50 hours as regular hours and 40 hours as overtime. In accordance with 29 C.F.R. § 778.104, the undersigned has determined Plaintiffs B. Martinez and Acuna worked 60 hours as regular hours and 30 hours as overtime. The Plaintiffs' two damages calculations are attached to this Report and Recommendation.

| | | | | |
|---|---|---|---|---|
| Ramos | 13 days | 13 x 10 = 130 | 80 hours | 50 hours |
| F. Martinez | 13 days | 13 x 10 = 130 | 80 hours | 50 hours |
| Renderos | 12 days | 12 x 10 = 120 | 80 hours | 40 hours |
| Ayala | 12 days | 12 x 10 = 120 | 80 hours | 40 hours |
| Campos | 12 days | 12 x 10 = 120 | 80 hours | 40 hours |
| Mayorga | 12 days | 12 x 10 = 120 | 80 hours | 40 hours |

214.    Based on the above determination of regular hours worked by each Plaintiff, the amount each Plaintiff should have been paid minus any payments received from Defendants is listed below.

| Plaintiff | Regular Hrs. x | Min. Wage - | Payment = | Reg. Pay Due |
|---|---|---|---|---|
| E. Perez | 80 hours | $5.15 | 0 | $412.00 |
| Castenda | 150 hours | $5.15 | 0 | $772.50 |
| B. Martinez | 60 hours | $5.15 | 0 | $309.00 |
| Acuna | 60 hours | $5.15 | 0 | $309.00 |
| S. Perez | 170 hours | $5.15 | $310.00 | $565.50 |
| Ramos | 80 hours | $5.15 | 0 | $412.00 |
| F. Martinez | 80 hours | $5.15 | 0 | $412.00 |
| Renderos | 80 hours | $5.15 | $100.00[17] | $312.00 |
| Ayala | 80 hours | $5.15 | $100.00 | $312.00 |
| Campos | 80 hours | $5.15 | $100.00 | $312.00 |

---

[17] The undersigned finds Defendant C. Holloway gave Plaintiffs Renderos, Ayala, Campos and Mayorga $100.00 each as an advance of their pay which they apparently spent to buy food. *See* Tr. 90:22 - 91:11 (Renderos); Tr. 109:16 - 110:2 (Ayala); Tr. 128:14 - 129:6 (Campos); Tr. 145:15 - 17 (Mayorga). The undersigned notes, when C. Holloway offered these Plaintiffs employment, he offered to provide lodging, not food. *See* Tr. 85:14 - 16 (Renderos); Tr. 107:1 - 6 (Ayala). Thus, the one hundred dollars given to each of these four Plaintiffs constitute a payment which is deductible from the unpaid minimum wages the Plaintiffs are entitled to receive.

| Mayorga | 80 hours | $5.15 | $100.00 | $312.00 |

215.    The overtime compensation owed to each Plaintiff is listed below.

| Plaintiff | Overtime Hours   x | Overtime Rate   = | Overtime Due |
|-----------|--------------------|-------------------|--------------|
| E. Perez | 60 hours | $15.00 | $900.00 |
| Castenda | 90 hours | $15.00 | $1,350.00 |
| B. Martinez | 30 hours | $15.00 | $450.00 |
| Acuna | 30 hours | $15.00 | $450.00 |
| S. Perez | 110 hours | $15.00 | $1,650.00 |
| Ramos | 50 hours | $15.00 | $750.00 |
| F. Martinez | 50 hours | $15.00 | $750.00 |
| Renderos | 40 hours | $15.00 | $600.00 |
| Ayala | 40 hours | $15.00 | $600.00 |
| Campos | 40 hours | $15.00 | $600.00 |
| Mayorga | 40 hours | $15.00 | $600.00 |

216.    The table below totals the regular amount and overtime amount due to each

Plaintiff.

| Plaintiff | Reg. Pay Due   + | Overtime Due   = | Total |
|-----------|------------------|------------------|-------|
| E. Perez | $412.00 | $900.00 | $1,312.00 |
| Castenda | $772.50 | $1,350.00 | $2,122.50 |
| B. Martinez | $309.00 | $450.00 | $759.00 |
| Acuna | $309.00 | $450.00 | $759.00 |
| S. Perez | $565.50 | $1,650.00 | $2,215.50 |
| Ramos | $412.00 | $750.00 | $1,162.00 |

| F. Martinez | $412.00 | $750.00 | $1,162.00 |
|---|---|---|---|
| Renderos | $312.00 | $600.00 | $912.00 |
| Ayala | $312.00 | $600.00 | $912.00 |
| Campos | $312.00 | $600.00 | $912.00 |
| Mayorga | $312.00 | $600.00 | $912.00 |

217.    By virtue of the default, Defendants have been found to have violated 29 U.S.C. §

206, with regard to minimum wages and 29 U.S.C. § 207 with regard to overtime wages.  Under

such circumstances an employer shall be liable for liquidated damages, equal to the total amount

of unpaid minimum wages and overtime compensation.  29 U.S.C. § 211.  Liquidated damages

are compensatory, not punitive, in nature.  *Roy v. County of Lexington*, 141 F.3d 533, 548 (4th

Cir. 1998).

218.    If an employer demonstrates to the satisfaction of the court that his failure to pay

minimum wages and overtime compensation was in good faith and that he had reasonable

grounds for believing his failure to pay was not in violation of the FLSA, a court may, in its

discretion, not award liquidated damages or may award any amount not to exceed the total

amount of unpaid wages and overtime compensation.  29 U.S.C. § 260; *Lockwood v. Prince

George's County*, 58 F. Supp. 2d 651 (D. Md. 1999), *aff'd* 217 F.3d 839 (4th Cir. 2000).  Section

260, an exception to the general rule that an employee receives liquidated damages, "puts upon

the employer the 'plain and substantial burden of persuading the court by proof that his failure to

obey the statute was both in good faith and predicated upon such reasonable grounds that it

would be unfair'" to award liquidated damages.  *Burnley v. Short*, 730 F.2d 136, 140 (4th Cir.

1984) (quoting *Wright v. Carrigg*, 275 F.2d 448, 449 (4th Cir. 1960)).

219.     Defendants did not present any evidence during the evidentiary hearing.  From the evidence presented the undersigned finds Plaintiffs requested their wages on multiple occasions from Defendant C. Holloway primarily through Defendant J. Holloway and N. Martinez.  Defendant C. Holloway argued that the Plaintiffs' wages were given to N. Martinez who was supposed to pay the Plaintiffs.  Even if true, Defendant C. Holloway was on notice that the Plaintiffs had not received any wages.  Further, when the first two groups of employees hired in July 2001 complained that they had not been paid, Defendant C. Holloway, if acting reasonable, would have made other arrangements to ensure the third group hired in November 2001 was paid.  The undersigned finds the Defendants have not demonstrated good faith and reasonable grounds for believing their failure to pay was not in violation of the FLSA.

220.     The undersigned therefore awards liquidated damages to each Plaintiff for a total award under the FLSA as listed below.

| Plaintiff | Total Unpaid Wages + | Liquidated Damages = | Total Award under the FLSA |
|---|---|---|---|
| E. Perez | $1,312.00 | $1,312.00 | $2,624.00 |
| Castenda | $2,122.50 | $2,122.50 | $4,245.00 |
| B. Martinez | $759.00 | $759.00 | $1,518.00 |
| Acuna | $759.00 | $759.00 | $1,518.00 |
| S. Perez | $2,215.50 | $2,215.50 | $4,431.00 |
| Ramos | $1,162.00 | $1,162.00 | $2,324.00 |
| F. Martinez | $1,162.00 | $1,162.00 | $2,324.00 |
| Renderos | $912.00 | $912.00 | $1,824.00 |
| Ayala | $912.00 | $912.00 | $1,824.00 |
| Campos | $912.00 | $912.00 | $1,824.00 |

| Mayorga | $912.00 | $912.00 | $1,824.00 |

221.   Plaintiffs also seek unpaid minimum wages and overtime compensation under the Maryland Wages and Hour Law, Md. Code Ann., Lab. & Empl. §§ 3-413, 3-415, and treble damages under the Maryland Wage Payment and Collection Law, Md. Code. Ann., Lab. & Empl. § 3-507(b).

222.   Plaintiffs acknowledge that the work they performed for the Defendants occurred in the Commonwealth of Pennsylvania and the State of Ohio.  Nevertheless, Plaintiffs contend the Maryland Wages and Hour Law regulates their employment.

223.   Plaintiffs argue they were employed by the Defendants in the State of Maryland, that the Defendants specifically came to Maryland to recruit them and the arrangements for the employment were made in Maryland.  Moreover, the employer provided transportation from Maryland to Pennsylvania.

224.   According to Plaintiffs, it was well known in the immigrant community in Langley Park, Maryland that the Defendants were recruiting workers from Maryland.

225.   Further, when wages were not paid, Plaintiffs made telephone calls to N. Martinez in Maryland.  "Phone calls were made back to Maryland and promises were made, inducements were given to the workers for them to continue their labor."  Tr. 152:14 - 16.

226.   Plaintiffs claim there is significant contact with the State of Maryland regarding their employment and thus their employment falls within the ambit of the Maryland Wages and Hour Law.

227.   The Maryland Wages and Hour Law defines employer as "includ[ing] a person

who acts directly or indirectly in the interest of another employer with an employee."  Md. Code. Ann., Lab. & Empl., § 3-401(c).

228.    The undersigned notes the General Assembly explained the purpose of this law, to set minium wage standards in the State of Maryland.  *See* Md. Code Ann., Lab. & Empl., § 3-402(b).

229.    The undersigned has not found any Maryland cases delineating the factors which establish that a person is employed in the State of Maryland and thus making that employment subject to the Maryland Wages and Hour Law and the Maryland Wage Payment and Collection Law.

230.    Plaintiffs' counsel acknowledges this is an issue of first impression.

231.    Relying upon the definition of employ, meaning to engage an individual to work, *see* Md. Code Ann., Lab. & Empl. § 3-101(c), Plaintiffs argue the Defendants employed or engaged them to work in the State of Maryland, although the work was performed outside the State, and thus Maryland law applies.

232.    Plaintiffs' counsel informed the court of an unpublished decision concerning a Workers Compensation claim that is adverse to Plaintiffs' position.  That case is *Hodgson v. Flippo Constr. Co.*, No. 861, 2005 WL 2233240 (Md. Ct. Spec. App. Sept. 15, 2005).

233.    In determining whether an employee is "regularly employed" in Maryland for purposes of Section 9-203 under the Workers' Compensation statute, the Maryland Court of Special Appeals considered the following factors: (1) where the employee was hired; (2) whether the employment arrangement contemplated the employee's regular presence in a particular jurisdiction; (3) the nature of the employer's work; (4) the scope and purpose of the hiring; (5)

duration of the employment (meaning consistency of the employee's work in a particular jurisdiction); and (6) representations by the employer regarding where the employee would be working. *Hodgson*, 2005 WL 2233240, at 3.

234.     The undersigned finds the *Hodgson* factors persuasive and will apply them to this case.

235.     Only one factor favors Plaintiffs' position — they were hired in Maryland.

236.     When each Plaintiff accepted Defendants' offer of employment, each Plaintiff knew he would work in Pennsylvania.  Defendants represented to the Plaintiffs that the work would be in Pennsylvania.  Except for Plaintiff Castenda, who worked in the State of Ohio, the other ten Plaintiffs worked exclusively in Pennsylvania.

237.     The undersigned finds the Plaintiffs were not employed in the State of Maryland.

238.     Plaintiffs are not entitled to unpaid minimum wages and overtime compensation under the Maryland Wages and Hour Law.

239.     Plaintiffs are not entitled to treble damages under the Maryland Wage Payment and Collection Law.

240.     Plaintiffs' counsel is not entitled to reasonable counsel fees and other costs under the Maryland Wage Payment and Collection Law.

241.     Under the FLSA an employee, as the prevailing party, is entitled to reasonable attorney's fees and costs of the action to be paid by the Defendant.  "The court in such action shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action."  29 U.S.C. § 216.  *See Burnley v. Short*, 730 F.2d 136, 141 (4th Cir. 1994) ("The payment of attorney's fees to

employees prevailing in FLSA cases is mandatory.").

242.   Plaintiffs seek attorney's fees in the amount of 10 percent of the damages.  *See* Tr. 154:16 - 21.

243.   Plaintiffs' counsel has not submitted an affidavit.

244.   The undersigned recommends a total damages award of $26,280.00.

245.   Ten percent of $26,280.00 is $2,628.00.

246.   An award of $2,628.00 as attorney's fees is a reasonable amount.

## RECOMMENDATIONS

247.   That Erma L. Holloway be dismissed without prejudice as a Defendant in this case.

248.   That Plaintiffs be awarded damages pursuant to the FLSA in the amounts listed below:

| *Plaintiff* | *Total Damages Awarded under FLSA* |
|---|---|
| E. Perez | $2,624.00 |
| Castenda | $4,245.00 |
| B. Martinez | $1,518.00 |
| Acuna | $1,518.00 |
| S. Perez | $4,431.00 |
| Ramos | $2,324.00 |
| F. Martinez | $2,324.00 |
| Renderos | $1,824.00 |
| Ayala | $1,824.00 |
| Campos | $1,824.00 |
| Mayorga | $1,824.00 |

249.    That unpaid minimum wages and overtime compensation not be awarded to Plaintiffs pursuant to the Maryland Wages and Hour Law.

250.    That treble damages not be awarded to Plaintiffs pursuant to the Maryland Wage Payment and Collection Law.

251.    That reasonable counsel fees and other costs not be awarded to Plaintiffs' counsel pursuant to the Maryland Wage Payment and Collection Law.

252.    That Defendants be ordered to pay attorney's fees to Plaintiffs' counsel in the amount of $2,628.00.


Respectfully submitted,

/s/

William Connelly
United States Magistrate Judge


November 23, 2005